Please call the first case. 18-2444, Robert McQuaid v. Presence Healthcare Services, Oklahoma. Okay, will counsels who are going to argue the matter please step forward. Good morning, Your Honor. Christopher Kelleher on behalf of the Planned Parenthood. Good morning, Your Honors. Karen DeGrand on behalf of the defendant, Apple Lee, present St. Mary and Elizabeth Medical Center. Okay. First of all, the microphone is just for recording, so please keep your voice up and try to speak into the microphone. Our colleague, Justice Gordon, will not be able to be here, but will be listening to the arguments on the tape. So he will be participating in the decision. And 15 minutes, rebuttal? Five minutes, Your Honor. Five minutes? All right. Okay. Ready to proceed? Yes, Your Honor. May it please the Court. This is an appeal of a directed verdict against the plaintiff, Roberto Nieves. The question presented is whether Nieves established approximate cause between Nurse Agustinian's negligence and his injuries. Is the basis of the negligence claim the lag in time between his complaint at 3.30 and her calling the doctor at 3.45? Yes and no, Your Honor. It is the lag in time, but we would say it goes beyond just that 15-minute or, as the trial court found, 10-minute time frame. But to answer your question, yes, it is the lag in time. So let me ask you this. Where is the testimony that the nurse's failure to notify the doctor at 3.35 contributed to his injury? Well, Your Honor, Dr. Boffa did testify to the fact that there was a delay and that this delay by the nurse caused or contributed to these injuries. The delay had a cascading effect in that at 3.45, firstly, just as the premise of your question, at 3.45 the call was made. The details of that call are unknown. All we know is that there was a call made. Both witnesses testified they don't remember the specifics. The only thing that was remembered was that the blood thinner was ordered to be discontinued. But nothing else we know of at that time. As to what the nurse was saying at that time as far as her records, we do know that these records she was recording at 15-minute intervals, zero pain, zero pain, zero pain, from 3.15 to 4 o'clock. So according to these records, again, these are black and white, they're there. As to Nurse Agostiniak, Mr. Nieves is in no pain. And that's obviously conflicting. Did the doctor say that she failed to notify him? I mean, aside from the issue of what's in the records, my question is more directed to what kind of testimony was presented that she actually failed to notify the doctor? Well, as far as the pain goes, there's no evidence that she notified the doctor that Mr. Nieves was in pain. All she said was, all we can gather from this phone call was that she asked Dr. Agarwal to come to the bedside. And that happened at 4 o'clock. So this time frame, and at that point, Mr. Nieves, by the time he got there, was in shock. So it was very difficult for Mr. Nieves to articulate exactly what his pain was, where his pain was. And that's why the 3.15 to approximately 3.45 window was so critical, because he was not yet, as we know, in a state of shock. And not only Mr. Nieves, but his brother and his son, they made it very clear, they testified that they had not only went into the hallway looking for staff, but also apprised Nurse Agostiniak that he was in this terrible condition, and he had this So this time lag, we make the point that time is important, but it's also an error of omission. And these were critical symptoms that should have been relayed by the nurse to the doctor, and they were not. And this delay, again, is what started this cascade of failures. And ultimately, from the time that the symptoms, say at 3.15, 3.30, these symptoms first appeared, it wasn't until three hours and seven minutes later that the actual diagnosis of retrocanial hematoma was made. And then almost another hour and a half before surgery began. So five hours elapsed between the actual procedure to remedy this situation. But how is that on the nurse? She calls the doctor at 3.45. How are you pinning her with that lag of five hours? Well, because the doctors were not aware. They were not made aware of what she knew. How do we know that? Because it took them three hours and seven minutes to diagnose. And Dr. Boffa did testify that a CT scan should have been run as early as 4 o'clock. And that CT scan would have diagnosed her. But how is that on the nurse? Once the nurse informs the doctor of his pain or spikes in temperature or his inability to eliminate, hasn't she completed her eyes or the surgeries or anything else? So how are we putting that on the nurse? Well, Your Honor, because... My mother's a nurse. I'm doing this for her. Understandable. Because, and I have my best, my most favorite aunt is a nurse as well, so she doesn't know I'm here today. I don't have any relatives here. The premise of your question, if I can quibble with that, the pain, that word that you used, that was not relayed. Was the lack of elimination, ability to eliminate, was that relayed? That was. That was. But it was discomfort. That was the word that was used, that Nurse Augustiniak used. And that word, she admitted on the stand that discomfort is not pain. Those are two different things. And her use of that word was very important because it did not accurately reflect what was going on. And didn't accurately reflect what was relayed from Mr. Nieves, from his brother and his son. So that is why it's critical that she did not give that information. And she admitted that relaying information from family members, if that information was there, she says it wasn't, that would be important. That would be relevant. But again, and these are issues of fact. These are questions of fact. Other than that, maybe just possibly a casual connection. It's not an approximate cause here. Well, I think that would be, Your Honors, that would be a question of fact, I think, as to what exactly the link between these two things. You know, we again would assert that this was approximate cause because, again, it prevented, it precluded the doctors from getting to actually what was going on. Which, obviously, five hours later they did. And in that five-hour time frame, substantial damage was done to Mr. Nieves' kidneys and GI tract. So, as to the nurse, again, the core of this case, the core of this issue, is failing to recognize timely this retropreneal bleed. And failing to recognize it and failing to relay that information, that's where the onus is on the nurse. Because she did not provide this information. And whether it's a ten-minute window, a three-hour window, again, this delay in treatment lessened his chance of recovery. And obviously the damage was severe. Fifty-four days in the hospital. He was in a coma for a couple weeks. You know, he still feels the implications of this to this day. Did you have any expert witnesses to testify about this ten-minute delay as it being the cause with regards to Mr. Nieves' condition? Your Honor, Dr. Boffitt did testify. I'll answer your question directly. I don't think it was directly to this ten-minute window. He did testify, generally speaking, to the delay. And whether it was ten minutes, whether it was a half hour, even that ten-minute window, that's enough, assuming that that's correct. That's enough because, again, at four o'clock, Dr. Boffitt testified. The CT scan should have been instituted and could have been. And that would have alleviated so much of Mr. Nieves' pain and suffering. And at the end of the day, time is tissue, okay? And ten minutes, half hour, this is a critical juncture, again, when Mr. Nieves is still, is basically still awake and not in shock yet. And this information could have been passed on and it wasn't. So there are no further questions I'll reserve. Okay, great. Thank you, Your Honor. Thank you. Good morning again, Your Honors. Good morning. Again, Karen DeGrant for the defendant, Appellee, President St. Mary and Elizabeth Hospital. It's not correct at all that Dr. Boffitt gave that testimony. Which testimony? The testimony linking the nurse's conduct to the injury. And, you know, I heard counsel describe a standard of care type of testimony, and that wasn't the basis for a motion for a directed verdict. Dr. Boffitt never gave the testimony that any alleged delay or any alleged failure to provide information by the nurse to Dr. Agarwal caused or contributed to cause any injury. And he, not only is that testimony absent, he specifically testified to the following. And this appears at pages, at page 1340 of the record. If nurse Agostiniak assessed the patient at 3.30 and called Dr. Agarwal by 3.45 undisputed and gave him a history undisputed and stopped the integral and death of blood thinner at 3.45, then did her actions cause any injury? No. I'm sorry. Her actions did not cause any injury, and the answer is yes. And there isn't a single word anywhere by Dr. Boffitt. And, of course, this kind of testimony has to come from a physician. Testimony linking the alleged violation of the standard of care, which, by the way, counsel said that there was a finding of a 10-minute gap by the judge. That wasn't a finding by the court. That was Nurse Gepke's actual testimony. So he made that clear, that he came up with this 10-minute gap. But it couldn't have any impact, as we know, based on Dr. Agarwal's testimony. And I have to also correct counsel's statement that Dr. Agarwal didn't know about pain. He specifically said he knew about pain when he was at bedside, page 2193 of the record. He specifically said that he wouldn't have done anything differently had he known about it 15 minutes early, you know, starting at page 2194 of the record. So, you know, the details, and as counsel acknowledged, the details of that call were unknown. But it just doesn't matter. It doesn't matter, as we know, because of Dr. Agarwal's testimony. And it doesn't matter, as we know, because there's nothing there from Dr. Boffitt. If anything, there's a denial that there's any causal link by Dr. Boffitt. So to the extent that counsel states that there's a question of fact as to delay, well, there wasn't a question of fact as to delay as to conduct of the nurse. And I think, you know, I think the case law that we cited in our brief is absolutely on point. And this, you know, we went through, you know, we certainly tried to look at every single site that the plaintiff set forth in the plaintiff's brief about where this alleged connection was in the record. Now, one citation, I did the same thing going through the plaintiff's reply brief where there's a couple of statements about, yes, the experts testified to that, and then no citation at all. It's not there. So I don't see any basis for the court to question the trial judge's decision. And it was an interesting comment in the plaintiff's reply that stating that the trial judge was giving, you know, was giving the defense side of it some sort of attributed that to being more correct than the plaintiff's. That's just not true at all. I think I counted eight places in the hearing on the motion for directed verdict and in the hearing the next day on the motion to reconsider where the judge said, well, I don't see it. Give me a page site. I don't see it. Tell me more. Show me, show me, show me, show me. He must have said that a dozen times, half a dozen times. I'm exaggerating a teeny bit. So it wasn't there, and the judge gave plaintiff every opportunity. And I also, I've addressed this substance because, frankly, I think it's very clearly dispositive, but there's a pretty significant procedural bar to what happened in this case. And, you know, the plaintiff's notice of appeal says that the plaintiff wants a new trial. It doesn't say who they want a new trial against, but the only party who they could possibly want a new trial against is the hospital. But the hospital had a, there was a judgment for the hospital, and that judgment was never challenged. So there is, whether you want to call it a forfeiture or a waiver for failing to file a post-trial motion or a jurisdictional problem because of the notice of appeal, or if you want to call it collateral estoppel or res judicata, one trial. One trial is all you get against a party. And there has been no request by the plaintiff to vacate the judgment that was entered on the jury's verdict. So there couldn't, there's, the only way to provide plaintiff relief would be two untenable options, in my view. This court would have to vacate a judgment that the plaintiff did not appeal and has not requested be vacated. Or the court would allow the plaintiff to try the same case arising out of the same transaction, we know it's a transactional test, against the same defendant, and then we have two judgments. And then what do we do with that? The jury already had, has heard and determined that there was no delay that caused an injury to Mr. Nieves. Plaintiff had a day in court. Any, and the response to that argument that plaintiff presented in the reply was that, well, it wouldn't be fair to apply those doctrines. What would be unfair about it? The plaintiff had every opportunity. There's not one bit of even argument that anything happened at the trial that was unfair. The plaintiff had a day in court. The unfairness that would potentially preclude the court from applying those estoppel doctrines would be, for example, the Nowak case where the court said, well, in the first case, the plaintiff didn't, wasn't able to try the case because there was no jurisdiction in federal court. And so, you know, no jurisdiction in the first time. There was never a presentation of the plaintiff's case. Well, the plaintiff certainly was able and fully presented the case here. And the court heard the evidence, considered it and considered it and considered it and said, I'm sorry, it's just not there. And that is a correct, accurate ruling. So if I can answer any questions, I'd be happy to do it. So if I understand you correctly, you're saying that Dr. Bafa did not testify that the delay caused the condition and also the failure to diagnose within that time of 10 minutes or 15 minutes? He didn't say anything to attribute the conduct of the nurse to any delay. Okay. And, you know, whether, you know, the question of any failure to diagnose by Dr. Agarwal is not being, is not, the plaintiff isn't asking the court to revisit that issue. You're trying to kind of intertwine it. Well, and it's, they're intertwined from the standpoint of that, you know, once, as Justice Brooks said, once the doctor has all the information, then that cuts off any question about what the nurse did or didn't do. And we know that from Gill and Seif and from these other cases that we cite in our brief. So there can't be any causal connection. Because the nurse isn't the person who's going to diagnose. The nurse reports the symptoms. The nurse says, we need the doctor to look at this. That happened. And that happened at 345 by everybody's account. In fact, plaintiff's counsel argued in the closing argument in this case that Dr. Agarwal was bedside at 345. So, you know, I'm not sure what exactly the basis was for that. But there's no question that he was called. But in this business of, well, she didn't tell him enough about pain or what the brother or the son said about pain, that's pure speculation. So that's our position. And we think that both procedurally and substantively that the defendant is entitled to affirmance of the judgment. Thank you. Thanks very much. Thank you. Nelson. Thank you, Your Honor. As to Your Honor's question concerning Dr. Boffa, he was asked at 4 o'clock to give an opinion as to whether the nurse's actions caused or contributed to the injuries. Answered, quote, that she failed to notify the physician of the change in the patient's condition. That's Dr. Boffa's answer. And that failure, again, as I stated … Wasn't he just trying to clarify the question there? No, Dr. Boffa's answer was that she failed to notify the physician of the change in the patient's condition. So that failure, again, as I said earlier, that's what started the ball rolling and kept the doctors in the dark as to what Mr. Nava's condition really was. As far as counsel's saying there's no questions of fact, I would respectfully disagree. This is a classic he said, she said. You have three witnesses saying, yes, we said there was pain in these areas, and the nurse chalked that up to mere discomfort. And as she herself admitted, discomfort is not pain. And this information would have been integral to the doctors to start this process at 4 o'clock, not wait three hours and seven minutes to finally find out what was going on. So, again, we respectfully would ask the court to reverse. As to the relief that we're seeking, obviously reversal and the nurse's actions, her conduct here was never before a jury. This ruling was taken, or excuse me, this issue was taken from the jury by the judge, and we would ask that the court reverse so Nurse Augustiniak's actions can be put forth before a jury and let the jury decide this classic credibility determination. What about counsel's comment about that it's kind of open with regards to what your request is for relief? You're just asking for a new trial. Yes, Your Honor. As to who? As to the nurse, Your Honor.  Yes. Because that simply was not before the jury. And she had a critical role in this drama, the fact that what she did not tell the doctors. Obviously, the doctors, if there was a remand, they would be out. We recognize that. Our case wouldn't be as strong without the doctors. But, again, her actions really put this ball in motion, and we would therefore ask that this be decided by a jury. Okay, great. Thank you. Thank you for your time. I want to thank counsels for a well-argued matter. We're going to take it under advisement. And, as I indicated before, Justice Gordon will be listening to the tapes and participating in this session. Thank you very much. Thank you.